UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
ROHINDRANATH KANHOYE,                            :
                         Plaintiff,        :
                  -against-                 :
 
ALTANA INC., ROBERT FAIVRE, HELEN CORSO,   :
and CHARLIE TIRRANO,                            :
 
                    Defendants.        :
------------------------------------------------------------------ x

<u>MEMORANDUM AND ORDER</u>

05-CV-4308 (ENV) (WDW)

VITALIANO, D.J.

       Plaintiff Rohindranath Kanhoye brings this discrimination and retaliation action against defendants Altana, Inc., Robert Faivre, Helen Corso, and Charlie Tiranno. His 35 count amended complaint pleads a litany of claims said to arise under Title VII, the Equal Pay Act, the New York State Human Rights Law (plus Nassau County's analog to it), and New York common law generally. Defendants now move for summary judgment on the claims charging unlawful retaliation, tortious interference with contractual relations, and gender discrimination. Defendants also argue that some of Kanhoye's prayer for relief, such as back pay, front pay, and certain benefits, is barred by after-acquired evidence. Plaintiff cross-moves for summary judgment on one of his retaliation claims and against defendants' after-acquired evidence affirmative defense.

       For the reasons set forth below, the Court grants partial summary judgment to defendants, and denies plaintiff's cross-motion in its entirety.

## **Background**

       The following facts are drawn from the amended complaint and the submissions of the parties on their motions for summary judgment, including their Local Rule 56.1

1

Statements and attached exhibits. The facts are construed, as they must be, in the light most favorable to the nonmoving parties. See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 456 (2d Cir. 2007). Any relevant fact disputes are noted.

1. Kanhoye's Tenure at Altana

Kanhoye is a dark-skinned male of South Asian racial background and Guyanese national origin. In August 1998, he joined Altana, a pharmaceutical company, as a full time Assistant Compounder, with a starting salary of $16.45 an hour. In 1999, he was granted his first annual salary increment (3.04%), raising his hourly salary to $16.95, and within two years, he had been promoted to Compounder, increasing his salary another 5.31% to $17.85 an hour. In each of the following four years, he received an additional salary increase between 4.1% and 4.4%, ultimately resulting in an hourly salary of $20.23 by 2004.

In December 2000, plaintiff was evaluated by supervisors on a performance appraisal form rating him on a five point scale, ranging from "below standard" to "outstanding", across each of 12 performance categories, including "thoroughness and orderliness", "speed of production", and "attendance". Kanhoye received the second highest rating, "above standard," on nine, and the middle ranking, "achieves standard," on the other three. He also received an overall rating of "above standard."

In June 2001, Kanhoye transferred to the Sterile Compounding Department in reliance upon an oral representation by that department's manager, Phil Hammer, that he would procure Kanhoye a pay raise in connection with the move. Kanhoye claims that he would not have transferred without a bump in salary because in the Sterile Department he would have to "gown up" by putting on scrubs, a sterile gown, goggles, and other clothing that he considered cumbersome. Kanhoye further asserts that female employees transferring to the Sterile Department told him that they had received additional compensation for "gowning up."

2

Although plaintiff's salary increased annually, his pay grade did not change when he was transferred, so he began to complain. In 2002, he met with Hammer and Faivre, the Director of Manufacturing, who explained that the transfer was a "lateral" move which did not include a pay raise, and that Hammer never intended for his statement to be a promise. But plaintiff was not placated, and he repeatedly complained to co-workers over the course of the following three years. He also believed that he was being discriminated against, observing that undeserving, American-born employees were receiving out-of-norm raises while he was being left behind.[1] He first mentioned his concerns about discrimination in September 2004, when he spoke to the Human Resources Department. Plaintiff subsequently met with Scott Mizwa, a Human Resources Generalist who was investigating the claims, and alleged that Faivre and Corso, Vice President of Manufacturing, were discriminating against him. Mizwa then met with Faivre, Corso, and Mindy Kirsch, the Vice President of Human Resources, and management agreed to review Kanhoye's compensation to determine if there were any inequities.

On September 21, 2004, Kanhoye met with Hammer and Faivre, and once again was told that his transfer was a lateral move. Approximately one month later, plaintiff met with Faivre and Mizwa, who attempted to reassure him that he had received fair and equitable increases in pay. However, Kanhoye continued to voice his disagreement with Altana's conclusion that his treatment was nondiscriminatory.

2. The 2004 Performance Evaluation

In December 2004, Kanhoye received another Performance Appraisal from his supervisors. The 2004 version of the evaluation form maintained a five-point ranking system,

---

[1]  Plaintiff devotes significant effort to presenting facts and arguments relevant to the issue of whether he was subjected to race or origin-based discrimination at Altana, which defendants controvert. These factual disputes are not relevant to the current motions for summary judgment on the issue of *retaliation* for his complaints.

ranging from "unsatisfactory" to "outstanding", but only rated the employee across nine categories of performance, some of which were identical to the categories in 2000. On the 2004 form, the overall rating was derived directly from the individual category scores, where each "outstanding" rating was worth four points, each "exceeds expectations" ranking was worth three points, and so on. In 2004, Kanhoye received two "outstanding" rankings, two "exceeds expectations," four "achieves expectations" (including for "attendance"), and one "below expectations" ("lateness").[2] These scores totaled 23 points, giving Kanhoye an overall rating of "achieves expectations," falling one point short of "exceeds expectations." Kanhoye was unhappy with this review, and refused to sign the form.

In January 2005, Kanhoye scheduled an appointment to meet with Corso to discuss his discrimination complaints, performance evaluation, and raise, which he claimed was less than warranted in retaliation for his complaints. On January 18, 2005, Corso and Mizwa told Kanhoye that the raise had already been reviewed, but he continued to reject their explanations.

3. The "Final Warning"

On February 7, 2005, Faivre and Kirsch prepared, signed, and sent to plaintiff a memorandum with the subject line "Final Warning." This was the first written warning Kanhoye had ever received at Altana. It advised him that Altana considered his constant complaints about compensation and performance evaluations to be unprofessional, inconsistent with corporate culture, and disruptive of work. Defendants claim that Altana issued this final warning for two reasons. First, Kanhoye's refusal to accept management decisions was upsetting work operations

---

[2] The "attendance" and "lateness" categories were evaluated based on objective criteria. Kanhoye received "achieves expectations" in attendance because he missed "4-7 days per year", while he was "below expectations" on lateness because he was late "3 [times] per quarter". Plaintiff has not alleged that his attendance or lateness scores were inaccurate or unjust.

4

and undermining dealings with co-workers. Second, Altana had received a report of offensive comments made by plaintiff during a retirement party thrown by the company at a restaurant on January 22, 2005. Three days after the party, Tiranno, the Director of the Validation Department, emailed Mizwa, stating that at this party Kanhoye "either insulted or threatened a number of people with whom we work," including Corso, Faivre, and Hammer. (Declaration of Gary H. Glaser Ex. S.) Tiranno described plaintiff's language as "very vulgar," and referenced a statement that "if this situation were personal" Kanhoye would "mess these people up." (Id.) Tiranno considered the comments to be "very threatening and intimidating," but he wrote that he did not want to cause Kanhoye's dismissal by writing the email. (Id.) Mizwa forwarded the email to Corso to "discuss next steps." (Id.) Kanhoye, however, denies ever making any of these comments at the retirement party.[3]

4. Kanhoye's Termination

On May 19, 2005, Kanhoye was informed by letter that he was fired. Defendants assert that the decision to terminate was based on Altana's receipt of a complaint of harassment and inappropriate behavior on May 11, 2005 by another employee, Noel Ramsammy, who claimed that Kanhoye had been taunting him for over a year. At a May 18, 2005 meeting with Faivre, Kanhoye asked for details regarding the complaint and the identity of his accuser, but he was told that the investigation was pending and that the complainant's name was being kept confidential. That same day, Mizwa emailed Corso, explaining that management had determined that plaintiff violated his final warning, thus finding that "termination would be the appropriate next step." (Glaser Decl. Ex AA.) Plaintiff, however, argues that Ramsammy's allegations were

---

[3] Kanhoye also denies that this email was actually sent to management prior to the issuance of his final warning, but his challenge to the email's authenticity rests solely on speculation. The Court, therefore, finds no genuine factual dispute with respect to the transmission and receipt of the email on January 25.

wholly fabricated.

## 5. Defendants' Post-Termination Discoveries

Defendants allege that after firing Kanhoye, they were approached by yet another employee, Eugene Davis, who told them that Kanhoye had made some "disturbing" comments threatening company management one day earlier. Although Davis did not initially take Kanhoye's comments "completely seriously," he reported them once he learned of the termination. In response, Altana ordered armed security guards be assigned to two of its locations. Plaintiff denies ever making the comments to Davis.

Undisputed, however, is the fact that during Kanhoye's November 16, 2006 deposition, Altana learned that he had lied on his initial employment application with the company. On this application, Kanhoye stated that he had left a prior employer because the company was relocating. However, he later admitted that he was actually fired for being involved in a physical altercation with a co-worker.

## **Discussion**

## 1. Standard for Summary Judgment

The Court's responsibility in assessing the merits of a summary judgment motion is not to try issues of fact, but rather to "determine whether there *are* issues of fact to be tried." Sutera v. Schering Corp., 73 F.3d 13, 16 (2d Cir. 1995) (quoting Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 244 (2d Cir. 1984)). The moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, see, e.g., Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005), and the Court will resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion. See, e.g., Sec. Ins. Co. of Hartford v. Old Dominion Freight Line. Inc., 391 F.3d 77, 83 (2d Cir. 2004); Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997) ("If, as to the issue on which

summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper").

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party. Fed. R. Civ. P. 56(e). The nonmoving party may not then rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmoving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . since a complete failure of proof concerning an essential element of . . . the non-moving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If the evidence favoring the nonmoving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted).

2. Retaliation

"An employee is privileged to report and protest workplace discrimination, whether that discrimination be actual or reasonably perceived." Matima v. Celli, 228 F.3d 68, 78 (2d Cir. 2000). Title VII therefore prohibits an employer from retaliating against an employee for opposing the employer's potentially discriminatory practices. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 56 (2006); Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003) ("Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'") (quoting Cosgrove v. Sears, Roebuck, & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)). Plaintiff claims that defendants unlawfully retaliated against him on three occasions: (1) by issuing him a "mediocre" performance evaluation in December 2004; (2) by giving him the final warning in February 2005; and (3) by

terminating him in May 2005.[4] Defendants argue that plaintiff is unable to establish a *prima facie* case of retaliation for any of the three actions, and, in any event, that they had legitimate nondiscriminatory reasons that preclude relief.

### a) The <u>McDonnell-Douglas</u> Burden-Shifting Analysis

Claims of unlawful retaliation are analyzed using the three-part burden-shifting analysis set forth by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). See <u>Terry</u>, 336 F.3d at 141 (explaining that "[t]he McDonnell-Douglas burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII.").[5] Plaintiff has the initial burden of establishing a *prima facie* case of retaliation by demonstrating that (1) he was engaged in a protected activity; (2) defendants knew that he was engaged in such activity; (3) defendants took an adverse action against him; and (4) there was a causal connection between the adverse action and the protected activity, "i.e. that a retaliatory motive played a part in the adverse employment action." <u>Cifra v. General Electric Co.</u>, 252 F.3d 205, 216 (2d Cir. 2001); <u>Reed v. A.W. Lawrence & Co., Inc.</u>, 95 F.3d 1170, 1178 (2d Cir. 1996); see <u>Pasqualini v. MortgageIT, Inc.</u>, 2009 U.S. Dist. LEXIS 68386, at *37 (S.D.N.Y. Aug. 5, 2009). Plaintiff's burden of proof in establishing his *prima facie* case is *de minimis*. <u>Donato v. Plainview-Old Bethpage Cent. Sch. Dist.</u>, 96 F.3d 623, 634 (2d Cir. 1996); <u>Everson v. N.Y. City Transit Auth.</u>, 2007 U.S. Dist. LEXIS 11251, at *35

---

[4] Altana and Faivre are listed as defendants for all three incidents of retaliation, but Corso is only listed as an individual defendant with respect to the termination claims. Tiranno is not listed as an individual defendant on any of the retaliation claims.

[5] The parties agree that the same analysis applies to retaliation claims brought pursuant to Title VII, 42 U.S.C. § 1981, N.Y. Exec. Law § 296, and the Nassau County Code C-2, § 21-9.8. See <u>McDowell v. T-Mobile USA, Inc.</u>, 307 Fed. Appx. 531, 532 n.1 (2d Cir. 2009) (explaining that claims brought under New York State and New York City human rights laws "are analytically identical to claims brought under Title VII", while claims brought under § 1981 "apply a substantially equivalent analytical framework"); <u>Coffey v. Dobbs Int'l Servs., Inc.</u>, 170 F.3d 323, 326 (2d Cir. 1999) (conflating analyses of retaliation claims under title VII and N.Y. Exec. Law § 296).

(E.D.N.Y. Feb. 16, 2007).

Demonstration of a *prima facie* case creates an inference of discrimination, such that the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory rationale for the adverse action. McDonnell, 411 U.S. at 802; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). A defendant's burden at this stage is, like the plaintiff's initial burden to establish a *prima facie* case, "not a demanding one; [a defendant] need only offer [a lawful] explanation for the employment decision. Bickerstaff v. Vassar Coll., 196 F.3d 435, 446 (2d Cir. 1999). However, though the burden of production shifts between the parties, the burden of persuasion is always on the plaintiff to demonstrate unlawful retaliation or discrimination. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); see DiCola v. SwissRe Holding N.A., Inc., 996 F.2d 30, 32 (2d Cir. 1993).

If a defendant articulates a legitimate rationale for the adverse action, the inference of discrimination "drops out of the picture" and the burden of production shifts back to the plaintiff to show that the defendant's articulated reason was merely a pretext. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993); Burdine, 450 U.S. at 255. "In the summary judgment context, this means that the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for [the adverse action] is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." Messer v. Fahnestock & Co., Inc., 2008 U.S. Dist. LEXIS 93572, at *50 (E.D.N.Y. Nov. 18, 2008) (quoting Morris v. N.Y. City Dep't of Sanitation, 2003 WL 1739009, at *4 (S.D.N.Y. Apr. 2, 2003)). A plaintiff may show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted

nondiscriminatory reasons." Id. at *50-*51 (quoting Taylor v. Family Residences & Essential Enters., Inc., 2008 U.S. Dist. LEXIS 6915, at *24 (E.D.N.Y. Jan. 30, 2008).

  b) *The 2004 Evaluation*[6]

Defendants argue that Kanhoye has failed at the third prong of establishing a *prima facie* case of retaliation based on the 2004 evaluation, because receipt of the "achieves expectations" overall rating does not constitute an adverse action. The Supreme Court has defined adverse actions in retaliation cases as those that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 57, 77. For "an employer's action to be adverse, it must rise above mere inconvenience to a dissatisfied employee." Sanders v. City of New York., 200 F. Supp. 2d 404, 407 (S.D.N.Y. 2002); see Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (change must be "more disruptive than a mere inconvenience or alteration of job responsibilities") (internal quotation marks omitted). Rather, a "materially adverse" change "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . ." Id. (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)).

At first blush, it is difficult to see how a non-negative "achieves expectations" rating could be materially adverse, particularly in light of case law which suggests that even negative evaluations may be insufficient to support a retaliation claim. See, e.g., Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 443 (2d Cir. 1999) (citing favorably to Smart v. Ball State Univ., 89 F.3d 437, 442 (7th Cir. 1996), which found "[t]here is little support for the argument that negative performance evaluations alone can constitute an adverse employment

---

[6]   With respect to all of the retaliation claims, defendants have not argued, for purposes of summary judgment, that plaintiff has failed to satisfy the first two elements of his *prima facie* case.

action"); Cf. Sanders, 200 F. Supp.2d at 407 (permitting supervisor to attach addendum containing negative comments about conduct to employee performance evaluation insufficient to establish materially adverse action). Here, however, Kanhoye has shown that the 2004 evaluation may have had a direct and readily calculable effect on his hourly salary. Kanhoye's supervisor testified at deposition that the one-point difference between "achieves expectations" and "exceeds expectations" ratings may have cost plaintiff "a half percentage point" in his hourly wage increase. (Deposition of Bruce Cordes, dated December 11, 2006, at 130.) This fact alone precludes the Court from finding the 2004 evaluation not materially adverse. See Holder v. City of Yonkers, 2006 U.S. Dist. LEXIS 37602, at *21 (S.D.N.Y. June 6, 2006) (noting that "negative employment evaluations . . . accompanied by other adverse consequences to the terms and conditions of the Plaintiff's employment" may qualify as adverse employment actions).

Defendants press on though, arguing that plaintiff cannot establish a causal connection between his protected complaints and the evaluation. Proof of causation in retaliation cases can be shown either (1) directly, through evidence of retaliatory animus directed against a plaintiff by the defendant, or (2) "indirectly, by showing that the protected activity was followed closely by discriminatory treatment or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." Pergament v. Fed. Express Corp., 2007 U.S. Dist. LEXIS 23732, at *45-*46 (E.D.N.Y. Mar. 30, 2007); see Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001) (indirect evidence includes showing that "the protected activity was closely followed in time by the adverse action"). Importantly, the subject performance evaluation came between two and three months after the complaints, which is a sufficiently short gap to permit a reasonable inference of retaliation at the prima facie stage. See Pergament, 2007 U.S. Dist. LEXIS 23732, at *46-*47 (two-and-a-half month period satisfies burden of showing indirect causation); Quinn v. Green Tree Credit Corp.,

11

159 F.3d 759, 769 (2d Cir. 1998) (termination slightly less than two months after filing complaint is sufficient causal connection); see generally Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001) (explaining that the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action"). Moreover, the December review was the first opportunity for defendants to evaluate Kanhoye after he began complaining of discrimination; a jury could conclude that an earlier opportunity to retaliate was unavailable. See Thomas v. iStar Fin., Inc., 508 F. Supp.2d 252, 257 (2007) (noting that a delay between activity and retaliation may not preclude a causal connection where a jury could infer that retaliation occurred "on the very first possible occasion following [protected] . . . activity") (quoting Coates v. Dalton, 927 F. Supp. 169, 170 (E.D. Pa. 1996)). As to this adverse action, Kanhoye has made out a *prima facie* case.

A *prima facie* case having been established, defendants must next establish a legitimate, nondiscriminatory reason for the identified adverse action. Defendants easily satisfy this similarly minimal burden, showing that plaintiff received his rating in part because of his "below expectations" rating in the category of "lateness," which was measured objectively as being late three times per quarter. Defendants also provide testimony from plaintiff's supervisors that confirm Kanhoye's attendance problem and their belief that he was not performing as efficiently as he had in previous years.

Although Kanhoye did establish a *prima facie* case, he cannot show a genuine factual dispute about whether defendants' proffered reasons for the 2004 evaluation were merely a pretext for retaliation. Kanhoye is unable to point to inconsistencies in defendants' story, and instead relies solely on his own speculation that Faivre manipulated the results because he had to

approve all employee evaluations. Kanhoye further provides his own vague deposition testimony that he was told by his supervisor that, with respect to the 2004 evaluation, "[the supervisor] did what Mr. Faivre asked -- wanted him to do." (Deposition of Rohindranath Kanhoye, dated Nov. 15, 2006, at 294.) Kanhoye, however, offers no evidence at all as to what it was Faivre actually wanted nor does he offer even a denial of the facts underlying the lateness evaluation. In short, plaintiff points to no facts or reasonable inferences that could lead a reasonable juror to conclude that the reasons for the adverse action proffered by defendants were pretextual. Defendants are entitled to summary judgment on this claim.

     *c)  The Final Warning*

     Conceding the obvious that the final warning constituted an adverse action, defendants argue that Kanhoye is unable to establish any causal connection between his protected complaint and its issuance. Although defendants frame this argument as alleging failure to make out a *prima facie* case, their arguments practically are almost exclusively directed toward showing that they had legitimate, nonretaliatory reasons for issuing the final warning. As a result, defendants are left with only one argument truly addressing plaintiff's actual obligation to show a causal connection, asserting that Kanhoye's reliance on the temporal proximity between his protected activity and the final warning is insufficient because the lapse of time between September 2004 and February 2005 is too great.

     Notwithstanding the ticking clock, the Court need not resolve the temporality question because defendants fail to confront key evidence that establishes causal connection on its own: the final warning itself. The document states that it resulted from the "numerous occasions [plaintiff] claimed to management that the Company has broken promises" and his refusal to accept his 2004 evaluation. (Glaser Decl. Ex. T.) The final warning further notes that the "Company has spent a substantial amount of time addressing your concerns" and that the

13

plaintiff's "conduct and demeanor in this regard" has been unprofessional and disruptive. (Id.) Bluntly, Altana could be found to have penalized Kanhoye for making complaints, including about discrimination. This alone establishes enough of a relationship between the protected complaints and defendants' issuance of the final warning.

On the other hand, while defendants' arguments fail to convince that plaintiff did not establish his *prima facie* case, the evidence they proffer in opposition does provide legitimate, nonretaliatory reasons for the issuance of the final warning. First, defendants distinguish Kanhoye's protected complaints about discrimination (substance) from unreasonable and offensive behavior that either accompanied the complaints or occurred during the same time frame (method and manner). It is the strain on working relationships resulting from Kanhoye's abusive and threatening protests, defendants claim, that actually prompted the final warning. Second, defendants point to Kanhoye's comments at the retirement party as the immediate cause of the warning.

When the smoke clears, however, a disputed material fact is revealed. Plaintiff has presented evidence sufficient to demonstrate that the reasons given by defendants were pretextual. For example, the retirement party incident did not occur during work hours or at the employment site, casting some doubt on claims of work disruption. Also, although the Court recognizes that allegations of discrimination cannot *per se* immunize a plaintiff against the consequences of offensive or inappropriate conduct, see Pulley v. KPMG Consulting, Inc., 348 F. Supp.2d 388, 397 (D. Md. 2004), aff'd, 183 Fed. Appx. 387 (4th Cir. 2006), in this case the allegedly unprofessional behavior is so closely intertwined with the act of complaining itself that the Court cannot parse the two as a matter of law. Third, the final warning does not address the retirement party conversation, nor does it mention any specific incident precipitating its issuance,

14

which works against defendants' claim that it was the true, underlying cause.[7] Finally, plaintiff

has pointed to Altana internal documents which reveal that other employees may have been

treated differently in a similar context. For example, two other employees received no less than

three written or verbal warnings, some of which were on an official "employee warning report"

form that permitted the employee to list reasons why they disagree with the action. One of these

employees had additionally received two separate two-day suspensions and a counseling session

prior to termination. Defendants note that these employees, like Kanhoye, were immediately

fired following complaints after issuance of a "final warning," but they do not address whether

these employees were treated differently leading up to their receipt of the final warning. All in

all, a reasonable juror on this record could, but need not, infer that defendants' proffered reasons

for the final warning were pretextual. Accordingly, both defendants' motion and plaintiff's

cross-motion for summary judgment on the retaliation claims based on the final warning are

denied.

### d) Termination

As might be anticipated, the retaliation claim based on Kanhoye's termination is

inextricably tied up with the retaliation claim based on the final warning. In fact, defendants

concede that they terminated plaintiff only after they determined that he had violated the

warning. Had the final warning not been issued, Kanhoye would not have been terminated for

the reasons given following the Ramsammy allegations. To the extent that a reasonable juror

could conclude that (i) retaliation ultimately caused the final warning, and (ii) defendants'

proffered reasons for the final warning were pretextual, they could also conclude that this same

---

[7]    In their reply brief, defendants note that at least three other employees had approached Faivre
regarding Kanhoye's behavior either prior to or during January 2005. Although they argue that these
incidents *could* have themselves warranted a final warning, they have not asserted that they would
have issued the final warning in the absence of the retirement party allegations.

retaliatory animus resulted in the subsequent termination shortly thereafter.  See Teachout v. N.Y. City Dep't of Educ., 2006 U.S. Dist. LEXIS 7405, at *47-*51 (S.D.N.Y. Feb. 27, 2006) (future decisions of employer based on evaluations motivated by retaliation could be tainted by that earlier animus).

While it is true that the Ramsammy allegations are offered as an additional nonretaliatory reason for termination, it simply was not an independent ground actually relied upon for termination at the time.  Even if one could divorce the final warning from the termination, a reasonable juror could still determine that the Ramsammy incident was merely a pretext for retaliation based on the circumstantial evidence that defendants never told Kanhoye specifically about Ramsammy and, as discussed above, plaintiff's warning, discipline, and termination may have been disparate when compared to that accorded other employees.  The claims of pretext present disputed material facts for a jury to resolve, not the Court.  The motions for summary judgment on the termination cause are denied.

3.  After-Acquired Evidence

Collaterally, defendants also move for summary judgment to preclude Kanhoye from obtaining back pay, front pay, and certain benefits as remedies because, subsequent to his termination, Altana learned of information which it claims would have independently warranted termination.  Specifically, defendants argue that Kanhoye would have been fired immediately upon learning of his alleged "egregious" comments to Davis threatening company management, or, separately, upon discovering the fraudulent nature of his employment application.

According to the after-acquired evidence doctrine, "evidence that the employee would have been terminated for lawful reasons will make certain remedies, such as reinstatement and front pay, unavailable." Greene v. Coach, Inc., 218 F. Supp. 2d 404, 412 (S.D.N.Y. 2002) (citing McKennon v. Nashville Banner Pub'g Co., 513 U.S. 352, 361 (1995)).  In addition, back

pay remedies may "be limited to salary lost from the date of the unlawful discharge until the date the employer discovered the information which would have led to discharge on lawful grounds." Flores v. Buy Buy Baby, Inc., 118 F. Supp. 2d 425, 432-33 (S.D.N.Y. 2000) (citing McKennon, 513 U.S. at 361-62). In order to limit a plaintiff's remedial relief for an unlawful termination, an employer "must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." McKennon, 513 U.S. at 362-63. If the plaintiff, however, is able to "raise a material issue of fact as to whether the after-acquired evidence would actually be a basis for termination," summary judgment is not appropriate. Greene, 218 F. Supp. 2d at 413.

Here, plaintiff is able to demonstrate an issue of material fact with respect to both scenarios proffered by defendants. Plaintiff disputes that he ever made the comments to Davis, creating an issue of Davis's credibility not suitable for summary disposition -- classic finger pointing. Further, defendants merely speculate that they would have fired Kanhoye upon learning about the threats, because, presumably, Altana would have conducted an investigation into whether the allegations were true. If Kanhoye never made the threats, Altana may have discovered either that the allegations were fabricated, or that there was insufficient independent verification to support termination. Indeed, defendants have not established that any time an employee is accused of making violent or threatening comments about other employees, that the employee is automatically fired.

As to the other branch of defendants' claims, plaintiff does admit that he lied on his Altana employment application, but the result is again no different for defendants because they cannot prove as a matter of law that they would have terminated Kanhoye on that ground alone. They present evidence that they have refused to hire several applicants for inconsistencies in employment applications, and that they did fire one employee after discovering an

17

inconsistency in such an application, but, viewing the evidence in the light most favorable to Kanhoye, defendants cannot sufficiently demonstrate that it is company *policy* to terminate employees for misleading employment applications in all circumstances. See Smith v. Tuckahoe Union Free Sch. Dist., 2009 U.S. Dist. LEXIS 91106, at *39 (S.D.N.Y. Sept. 30, 2009) (finding issue of fact whether employer would have fired employee for false information on job application despite affidavits from employer asserting that the employee would never have been hired or would have been fired once it was discovered that his prior employer asked him to resign); Quinby v. WestLB AG, 2007 U.S. Dist. LEXIS 28657, at *47-*48 (S.D.N.Y. Apr. 19, 2007) (finding issues of fact regarding whether defendant employer had policy by which it would have terminated employee for misstatement on job application, even where application warned that "falsified statements on this application shall be grounds for dismissal"); Flores, 118 F. Supp. 2d at 432-33 (finding issues of fact whether defendant would have fired plaintiff solely on the basis of falsified employment application). Defendants' motion for summary judgment on this claim is denied, as is plaintiff's cross-motion, given the triable issues of material fact that are presented regardless whether the evidence is viewed most favorably for defendants or for plaintiff.

4. Gender Discrimination

Kanhoye also alleges gender discrimination under the Equal Pay Act, Title VII, the New York State Executive Law, and the Nassau County Administrative Code, on the basis that female employees who transferred into the Sterile Compounding Department were compensated for "gowning up," while plaintiff and other males were not so compensated. Defendants move for summary judgment, and plaintiff offers no argument in opposition.

To prove a violation of the Equal Pay Act, 29 U.S.C. § 206d(1) (2009), a plaintiff must first establish a *prima facie* case of discrimination by showing: (1) the employer pays

18

different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions. Bronzini v. Classic Security, LLC, 2009 U.S. Dist. LEXIS 2865, at *19 (S.D.N.Y. Jan. 15, 2009) (citing Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999)). Once a plaintiff makes out a *prima facie* case, the burden shifts to the employer to justify the wage differential by proving that the disparity in wages results from one of the Equal Pay Act's affirmative defenses, such as "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of product; or (iv) a differential based on any other factor other than sex." Id. at *19-*20 (quoting 29 U.S.C. § 206(d)(1)). Claims under Title VII, the New York Executive Law, and the Nassau Administrative Code are "generally analyzed under the same standards used in an EPA claim." Belfi, 191 F.3d at 139 (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1312 (2d Cir. 1995); see Kahn v. Objective Solutions, Int'l, 86 F. Supp. 2d 377, 380 (S.D.N.Y. 2000).

Independently reviewing the record, it is clear that plaintiff has failed to demonstrate a *prima facie* case of gender discrimination. His claim is based solely on his own testimony that an unspecified female colleague told him that she was obtaining additional compensation for "gowning up," from which he concludes an intent to discriminate on the basis of gender. Even if Kanhoye could demonstrate disparate treatment, defendants have explained that the compensation increase received had nothing to do with gender but with the employee moving from a minimum salary in one department to a higher minimum salary in the new department. In sum, there is no material fact in dispute. Defendants are entitled to summary judgment, and Kahoye's gender discrimination claims are dismissed.

5. Tortious Interference with Contractual Relations

Lastly, plaintiff alleges that Faivre and Corso exceeded the limits of their

authority and tortiously interfered with his contract with Altana when they terminated his employment. Under New York law, a plaintiff must demonstrate the following elements to establish a claim of tortious interference with contractual relations: "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." Albert v. Loksen, 239 F.3d 256, 274 (2d Cir. 2001) (quoting Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir. 1996)). Defendants argue that plaintiff cannot sue Faivre and Corso on this ground because he had no contract with Altana, and because Faivre and Corso were not third parties. Kanhoye concedes that he was an "at-will" employee of Altana, and had no written contract of employment. See Sabetay v. Sterling Drug, Inc., 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 211, 506 N.E.2d 919, 920 (1987) ("[A]bsent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party."). However, the parties dispute whether an at-will employee can assert that he has a "valid contract" sufficient to maintain a tortious interference claim.

Obviously, it makes no sense to entertain a suit for tortious interference with contractual relations when there are none. The New York Court of Appeals recognized this fact when it stated:

> In holding that there is no cause of action in tort for abusive or wrongful discharge of an at-will employee, we declined to allow the use of substitute nomenclature or causes, such as a prima facie tort . . . to bootstrap the threshold deficiency in a wrongful discharge claim. Similarly, the plaintiff here cannot be allowed to evade the employment at-will rule and relationship by recasting his cause of action in the garb of a tortious interference with his employment.

Ingle v. Glamore Motor Sales, Inc., 73 N.Y.2d 183, 188-89, 538 N.Y.S.2d 771, 773-74, 535 N.E.2d 1311, 1313 (1989) (internal citations omitted); see McHenry v. Lawrence, 2009 N.Y. App. Div. LEXIS 7056, at *2 (2nd Dep't Oct. 6, 2009). Yet, what appears to be a universal

prohibition is hardly that. New York law does recognize that "the at-will relationship entails certain limited rights, including the right to maintain an action for tortious interference in certain limited situations." Finley, 79 F.3d at 1294-95 (internal citations omitted); Accord Lowenbraun v. Garvey, 60 A.D.3d 916, 917, 876 N.Y.S.2d 441, 442 (2d Dep't 2009).

But, the dark sky of prohibition admits to just a tiny glimmer of light. Where such claims are akin to a claim for tortious interference with business relations or prospective business advantage, they may only then gain some traction. See generally Restatement (Second) of Torts § 766 cmt. g (1979). Under New York law, this class of tort does not require showing interference with an existing contract, but rather that a defendant "acted for a wrongful purpose or used dishonest, unfair, or improper means" to interfere with a business relationship of some kind. Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008), cert. denied, Catskill Dev., L.L.C. v. Harrah's Operating Co., 129 S.Ct. 1908 (2009); see Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 214 (2d Cir. 2002). Stated broadly, then, where there is wrongful interference with some business relationship (including an at-will employment relationship), a tortious interference claim will lie notwithstanding the absence of a binding contract. See Albert, 239 F.3d at 274-75; Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 194, 428 N.Y.S.2d 628, 634, 406 N.E.2d 445, 451 (1980) ("Where contracts terminable at will have been involved, we have upheld complaints . . . for interference when the alleged means employed by the one interfering were wrongful").

For plaintiff, the good news ends there. To make out a tortious interference claim, a plaintiff must still establish that a "third party used wrongful means to effect the termination." Albert, 239 F.3d at 274 (quoting Cohen v. Davis, 926 F. Supp. 399, 403 (S.D.N.Y. 1996)). Here, Kanhoye's claim for tortious interference fails as a matter of law because he cannot establish that Faivre and Corso were third parties to the employment relationship between

21

himself and Altana. A plaintiff may only maintain "an action for tortious interference against a co-employee by showing that the co-employee 'acted outside the scope of [his or her] authority'" by inducing the employer to terminate. Albert, 239 F.3d at 275 (quoting Kosson v. Algaze, 203 A.D.2d 112, 113, 610 N.Y.S.2d 227, 228 (1st Dep't 1994)). More critically, "[a] supervisor is considered to have acted outside the scope of his employment if there is evidence that the supervisor's manner of interference involved independent tortious acts such as fraud or misrepresentations, or that he acted purely from malice or self interest." Cohen, 926 F. Supp. at 404.

On this record, Kanhoye cannot demonstrate any such fraud, misrepresentation, or malice on the part of Faivre and Corso beyond, perhaps, his own unsupported speculation. There is no dispute about the material fact that when Faivre and Corso decided to terminate Kanhoye, they did so in their capacity as Altana management, and in such positions, they were not only authorized to perform the challenged acts but were also, in fact, regularly involved in employee personnel decisions. Neither Faivre nor Corso, therefore, could be said to have been acting outside the scope of their authority. In such circumstances, plaintiff's tortious interference claims do not lie. Furthermore, the retaliatory and discriminatory acts Kanhoye alleges they committed would be insufficient to establish "independent tortious act[s]" under New York law to sustain a tortious interference claim brought by an employee they managed. See Baguer v. Spanish Broad. Sys., Inc., 2007 U.S. Dist. LEXIS 70793, at *9 (S.D.N.Y. Sept. 25, 2007) (explaining that "alleged violations of federal, state, and city anti-discrimination laws are not torts under New York law"). Simply put, Kanhoye was an at-will employee and, regardless of "substitute nomenclature," Ingle, supra, a state claim grieving employment termination by that very employee's supervisors acting within the scope of their authority simply does not lie as a matter of New York law. The tortious interference claims are dismissed.

22

## Conclusion

As a consequence of the foregoing, the summary judgment motion of defendants Altana, Inc., Robert Faivre, Helen Corso, and Charlie Tiranno is granted to the extent that plaintiff's claims for (1) retaliation on the basis of the 2004 Performance Evaluation, (2) gender discrimination, and (3) tortious interference with contractual relations are dismissed. The balance of defendants' motion and plaintiff's cross-motion in its entirety are denied.

SO ORDERED.

Dated: Brooklyn, New York
December 3, 2009

s/ ENV

_____

ERIC N. VITALIANO
United States District Judge